United States District Court
Southern District of New York
-------------------------------------------x

**15CV 3065**

**UNITED STATES OF AMERICA,**                Case No.:    13 CR 711(LGS)

          Plaintiff,

v.

**ANIL DHAWAN,**

          Defendant.
-------------------------------------------x

MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 28 U.S.C. § 2255

COMES NOW defendant, Anil Dhawan ("Mr. Dhawan"), appearing *pro se*, and hereby submits this Motion and Memorandum in support for vacating, setting aside and/or correcting his sentence in this case pursuant to 28 U.S.C. § 2255 and respectfully requests that he be sentenced to six months confinement or less.

## APPLICATION

Mr. Dhawan was sentenced by this Court on September 24, 2014, *inter alia*, to 15 months incarceration. He did not appeal his sentence or conviction. This motion is timely pursuant to 28 U.S.C. § 2255.[1]

Mr. Dhawan's case presents a unique instance in which his voluntary waiver of his

---

1  A motion by a federal prisoner for post-conviction relief under 28 U.S.C. § 2255 is subject to a one-year time limitation that generally runs from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1); *Clay v. United States*, 537 U.S. 522, 527 (2003). In Mr. Dhawan was sentenced and convicted on September 24, 2014 . Thus, this Motion is timely filed on or before September 24, 2015.

removal rights, unusually harsh conditions of confinement, and rebuilding his life in a foreign less developed country, for his wife, U.S. citizen children and himself, upon being deported, after he made the United States his home for over two decades, serves as three deserving bases for a further downward variance, that were not addressed by defense counsel and hence was not considered by the Court.

This petition is not foreclosed by the plea agreement's waiver clause, because the sentence imposed is, inconsistent with (or not addressed) by letter and spirit of the stipulated plea agreement especially when the parties and Court recognized the possibility of deportation. *See* Letter of Proffer Agreement, dated, December 20, 2013, p. 4. These issues, together with 18 U.S.C. Sec. 3553(a) factors such as a reduced need to protect society, support a further variance from the United States Sentencing Guidelines (hereinafter "U.S.S.G." or "Guidelines"). *United States. v. Wills*, 476 F.3d 103, 109 (2nd Cir. 2007) ("It may be that a sentencing judge can consider deportation when he or she identifies, with some particularity, why a specific defendant is certain to be deported and why deportation, in light of that defendant's individual circumstances, will serve to protect the public."). As the Court did not consider his voluntary waiver of his removal rights, unusually harsh conditions of confinement, and establishing a future for his wife, U.S. citizen children and himself in a less developed country after he is deported, nor was a departuer/variance granted individually, Mr. Dhawan requests the Court now consider these factors, in combination, as a basis for a reduction in his sentence. *See* U.S.S.G. Sec. 5K2.0(c).

## BACKGROUND

As fraudsters go, Mr. Dhawan was hardly a kingpin. Mr. Dhawan, low down on the totem-pole, facilitated a fraud for the kingpin: in three separate loan applications, lied to the banks so that they would incur lending risks that they had no knowledge about. Mr. Dhawan a struggling business consultant did not know that the kingpin would run away with the loot and become the prosecution's cooperating witness, subsequently, pointing his finger at Mr. Dhawan and others, in exchange for a significantly lower and less onerous sentence.

Mr. Dhawan had never been in prison before, nor did he have any run-ins with the law. He has been in the United States for over two decades, since 1992. He married in 1996 and has two children, ages 16 and 9. Prior to his incarceration, he resided with his wife and children in New York and they are a tight knit family. Throughout his life in the United States, prior to incarceration, Mr. Dhawan had been gainfully employed and dutifully and with pleasure financially supported his family. Mr. Dhawan has always paid his taxes and to this day he continues to pay his taxes, even while he is incarcerated.

## ARGUMENT

Eric Holder, the Attorney General, declared that America has an "unnecessary large prison population * * *. Too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason." [2] This presaged an even bolder step: attacking the unfair sentencing regime. That is putting it mildly. According to the Department of Justice,

---

2 See August 12, 2013, *Attorney General Eric Holder Delivers Remarks at the meeting of the American Bar Association's House of Delegates* www.justice.gov/print/PriontOut3.jsp, accessed August 13, 2013

3

the Land of the Free has 5% of the worlds population, but 25% of its prisoners. In all, about 2.2 million Americans fester behind bars; one in every 107 adults. Minor crimes, such as Mr. Issa's, are punished severely, serious ones ferociously. The cost is staggering: $80 billion a year or $35,000 per inmate, not to mention "human and moral costs that are impossible to calculate," as Mr. Holder put it. America's prisons are often harsher that those in other rich countries. [3]

America's so-called penchant for mass-incarceration has for decades been taken for granted as set-in-stone policy. But has been at a terrible cost. American Courts and politicians have assumed that mass incarceration works, wooing voters with ever-tougher sentencing laws. The dramatic fall in crime since the 1990s has persuaded many that they were right. Locking up the worst criminals while they are young, fit and dangerous clearly makes America safer. But, that policy has also laid bare the discrimination embedded in the justice system. Minorities, like Mr. Dhawan, are disproportionally affected by an inflexible system that refuses courts the right to tailor punishment to the circumstances to the crime. Mr. Holder wants to circumvent the system. Mr. Holder's timing is propitious, the Court must follow suit.

---

3  European countries now let prisoners cast ballots; Prisoners in Philippines are among the few allowed to surf the web, albeit closely supervised. In November 2012, Tanzania's government worried by the high sexual abuse in prison said it was introducing conjugal visits. In 2011, Brazil and Costa Rica formally extended rights to all gay prisoners, Israel did the same in July. Opportunities for prisoners to work, retrain and help local people are blossoming in places like China that is active in teaching wrongdoers new skills. Scandinavians favor rehabilitation. They see prison as a last resort and loss of freedom arduous without extra hardship. Life of Norway's 3,600 prisoners is quotidian – with bungalows, televisions and mini-markets – to prepare them for release. America, meanwhile, emphasizes retribution. Incarceration and "warehousing" is common.

The Sentencing Commission intended for each guideline to carve out a " 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S. Sentencing Guidelines Manual, ch. 1, pt. A(4)(b) [hereinafter U.S.S.G]. The guidelines specify certain factors that are encouraged or discouraged. See U.S.S.G.§§ 5H, 5K. Other than for crimes related directly to alien status, such as illegal re-entry into the country, the guidelines do not mention the effects of alien status as a departuer/variance factor. *United States v. Restrepo*, 999 F.2d 640, 644 (2d Cir.1993). If a factor is unmentioned in the guidelines, the court must consider the "structure and theory of both the relevant individual guidelines and the guidelines taken as a whole," to determine whether the factor makes the case unusual or atypical enough to take the case out of the heartland. *Koon v. United States*, 518 U.S. 81, 91, 96 (1996) (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993)). In doing this, the court must be cognizant of the fact that the Commission expected departures based on unmentioned factors would be "highly infrequent." U.S.S.G. Ch. 1., Pt. A(4)(b).

The Second Circuit held that although alienage may be a basis for departuer/variance in some circumstances, the particular collateral consequences the defendant faced in that case as a result of being a deportable alien (ineligibility for placement in community-confinement for the last six months of his sentence, post-imprisonment detention while awaiting deportation, and deportation itself) could not support a departuer/variance. factor. *United States v. Restrepo*, 999 F.2d 640, 644-47 (2d Cir.1993). Several other circuits have followed the rationale of *Restrepo*. *See United States v. Veloza*, 83 F.3d 380, 382 (11th Cir.1996), overruled on

5

other grounds by *United States v. Campbell*, 181 F.3d 1263 (11th Cir.1999); *United States v. Mendoza-Lopez*, 7 F.3d 1483, 1487 (10th Cir.1993); *United States v. Nnanna*, 7 F.3d 420, 422 (5th Cir.1993). To the extent that these cases suggest that factors related to alien status may never be a basis for departuer/variance, they are inconsistent with *Koon*, which made it clear that courts may not declare what sentencing factors are inappropriate in every circumstance. 518 U.S. at 106, 116 S.Ct. 2035; see also *United States v. DeBeir*, 186 F.3d 561, 569 (4th Cir.1999) (noting that the above cases were all decided prior to *Koon*, which limits the authority of appellate courts to categorically limit possible departuer/variance factors); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (same).

### A.     Voluntary Removal from the United States: Sec. 5K2.0

Mr. Dhawan requests a downward departure/variance based on his agreement to "plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction even if those consequences include deportation from the United States at the completion of his sentence." Proffer Agreement, dated December 20, 2013, p. 5. In return, Mr. Dhawan agrees to waive any procedural rights he has to an administrative removal proceeding.

Mr. Dhawan has both standing to demand an immigration hearing and substantial positive evidence to present at any removal hearing. Although Mr. Dhawan faces deportation proceedings based on this conviction, Mr. Dhawan could seek protection under the Convention Against Torture and establish that it is "more likely than not" that he would be

tortured if returned to India. 8 C.F.R. § 1208.16(c)(2); *Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002).[4] He would therefore be exempt from expedited removal proceedings. *See* Immigration and Nationality Act Sec. 238(b), as amended by 8 U.S.C. Sec. 1228(b). The other members of Mr. Dhawan's family are all either United States citizens, or in the process of naturalization.

---

4   In assessing whether an applicant has satisfied the burden of proof, the Court must consider all evidence relevant to the possibility of future torture, including evidence of past torture inflicted upon the applicant, evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured, evidence of gross, flagrant, or mass violations of human rights within the country of removal, and other relevant information regarding conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3); *Matter of G-A-*, 23 I&N Dec. 366 (BIA 2002).
Human rights groups often indicate that torture is endemic to the Indian Police and routinely used. Those seen or known as being "anti-national" are particularly subjected to brutal treatment. Mr. Dhawan's case is particularly significant because in addition to returning to India after two decades, he will be living in Kanpur – a city notorious for police brutality, as he has been deported form the United States and thus deemed "anti-national."
In its *World Report 2012*, Human Rights Watch stated that "police abuses included torture." The U.S. *Country Reports on Human Rights Practices for 2010* also report that police stations in India "use torture to obtain desired testimony."

>   In the landmark case, as early as 1980, the Supreme Court of India, in *Raghubir Singh v. State of Haryana*, All India Reporter (AIR), 1980, Supreme Court (SC), 625, held that:
>   "...[w]e are deeply disturbed by the diabolical recurrence of police torture resulting in a terrible scar in the minds of the common citizen, that their lives and liberty are under peril when the guardians of the law gore human rights to death. The vulnerability of human rights assumes a traumatic, torture some poignancy when violent violation is perpetrated by the police ... whose function is to protect the citizen and not to commit the gruesome offenses against them as has happened in this case. Police lock-ups, if reports in newspapers have a streak of credence, are becoming more and more awesome cells ... [t]he State, at the highest administrative and political levels, we hope, will organize special strategies to prevent and punish brutality by police. Otherwise the credibility of the rule of law in our Republic vis-a-vis the people of the country will deteriorate..."
>
>   In 1981, in a similar case, *Kishore Singh v. State of Rajasthan*, AIR, 1981, SC 625, the Supreme Court of India reiterated:
>   "... [n]othing is more cowardly and unconscionable than a person in police custody being beaten up and nothing inflicts deeper wound on our constitutional culture than a state official running berserk regardless of human rights."

In fact, the United States Department of State documents notes that "[t]here is still widespread harassment of anyone who expresses separatist sympathies," that "individuals are 'probably targeted' at times by local police," and that "reports of [detention and physical abuse] seem[ ] plausible given conditions in India." In addition, the Department of State explicitly mentioned that there were "credible reports that police throughout the country often did not file legally required arrest reports, resulting in hundreds of unsolved

7

Mr. Dhawan has had a steady business, and his customers are willing to appear at hearings on his behalf. Mr. Dhawan has therefore demonstrated that he has a "colorable, non-frivolous defense to deportation" and that his waiver of his procedural rights and defenses "will substantially assist the administration of justice." *United States v. Ramirez-Marquez*, 372 F.3d 935, 938 (8th Cir. 2004). *See also infra* n. 9-12.

As the Court, during sentencing, recognized, it was appropriate to grant Mr. Dhawan a downward variance for agreeing to "plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction even if those consequences include deportation from the United States at the completion of his sentence," but the court did not factor in the impact of his voluntary waiver of his removal rights, unusually harsh conditions of confinement, and rebuilding his life in a foreign less developed country, for his wife, U.S. citizen children and himself, upon being deported, after he made the United States his home for over two decades.

Immigration enforcement matters are different. Of the plethora of "civil" consequences stemming from a criminal conviction, deportation is a particularly severe penalty, "the equivalent of banishment or exile," *Delgadillo v. Carmicheal*, 332 U.S. 388, 391 (1947) which may result in the "loss ... of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). In *United States v. Jauregui*, 314 F.3d 961 (8th Cir. 2003), the Court approved a four-level downward departure/variance for an alien convicted of a drug trafficking offense,

---

disappearances in which relatives claimed that an individual was taken into police custody and never heard from again." *See* United States(US) April 8, 2011. Department of State *"India" Country Reports on Human Rights Practices for 2010*

8

who agreed to waive removal proceedings. The Court noted "a waiver of the administrative deportation proceeding due to an alien is a sufficient basis for a downward departure/variance," as it saves the government the time and effort of removal proceedings. *United States v. Jauregui*, 314 F.3d at 963-964. Mr. Dhawan, as all the parties will agree, is less morally culpable than Mr. Jauregui based on the Guideline range in this case, the fact he is waiving all the same due process rights, and the fact he is greatly assisting with the administration of justice by waiving all hearings and appeals. It is therefore appropriate for him to receive the same quality departure/variance as the Eighth Circuit approved for Mr. Jauregeui.

B.   **Severity of Prison Conditions: Sec. 5K2.0.**

Mr. Dhawan next requests a downward variance because he is suffering a sentence substantially more onerous prison term than anticipated by the framers of the Guidelines. A downward variance based on the collateral consequences of alienage is appropriate where "there is a substantial, undeserved increase in the severity of conditions of confinement, which would affect a substantial portion of a defendant's sentence." *United States v. Lopez-Salas*, 266 F.3d 842, 850 (8th Cir. 2001). Mr. Dhawan's case warrants a departure/variance under this standard. see *United States v.. Guzman*, 236 F.3d 830, 834 (7th Cir.2001) ( "we emphasize that ... status as a deportable alien is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for ...

9

[an] offense").

The heartland defendant in this case would serve less than one year in a minimum security camp. *See* Federal Bureau of Prisons Program Statement 5100.08 (Sep. 12, 2006) at Chapter 5-2; [5] he would have been placed for work a UNICOR work facility; [6] would have been housed at a facility closer to the family;[7] qualify for placement at a half-way house for part of his sentence. *See* 28 C.F.R. Sec. 550.56 and be reunited with the family at the earliest possible time. Mr. Dhawan, on the hand, being designated with a PSF of Deportable Alien, [8] he will serve a longer, harder sentence because he is subject to deportation proceedings.

Purely based on alienage, Mr. Dhawan is not "eligible for assignment to minimum security facilities, nor for up to one year release upon completion of a drug treatment program, nor for serving the final ten percent (up to six months)" in a half-way house. *United States v. Lopez-Salas*, 266 F.3d at 845, 849.

---

5   Bureau of Prisons' institutions are classified into one of five security levels: Minimum, Low, Medium, High, and Administrative based on the level of security and staff supervision the institution is able to provide.
6   UNICOR "is the trade name for Federal Prison Industries, Inc., a government corporation that provides work and training opportunities for federal inmates." *United States v. Thompson*, 227 F.3d 43, 45 n. 4 (2d Cir.2000) (citing 28 C.F.R. § 345.11(a)).
7   RRCs, more commonly known as "halfway houses," are minimally secure community based facilities in which certain eligible BOP inmates may be placed upto the last year of their terms of imprisonment to facilitate their transition into the community upon completion of their terms of imprisonment.
8   A PSF is "relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that requires additional security measures be employed to ensure safety and protection to the public." *See*, Bureau of Prisons, Program Statement, P5100.08, Chapter 5, p. 8. A PSF requires increased security measures to ensure protection of the public. *Id.* at p. 4. There are nine PSFs which are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community (*i.e.* Minimum Security). *Id.* The application of a PSF overrides security point scores to ensure the appropriate security level is assigned to an inmate, based on his or her demonstrated current or prior behavior. A PSF of Deportable Alien is applied to inmates that have a possibility of deportation. *Id.* at p. 11. With a PSF of Deportable Alien, an inmate cannot be designated to a facility with a security classification below a Low, participate in the RDAP program pursuant to 18 U.S.C. § 3621(e) nor the RRC program.

Not only is he agreeing to remove himself from the United States, his security level is been increased and he has been denied rehabilitation, eligibility for camps, and early release. *Lopez-Salas* at 849. Because Mr. Dhawan's alienage enhances his security level, he will also be foreclosed from compassionate furlough provisions to visit with his family. *See* Bureau of Prisons Program Statement 5280.08 Sec. 570.34 (Feb 4, 1998). This case is therefore factually comparable to *U.S. v. Bakeas*, 987 F. Supp. 44 (D. Mass. 1997), in which the Eighth Circuit stated that such onerous conditions would warrant a departure/variance. *Lopez-Salas* at 850 n. 5. In sum, the unique facts of this case result in an undeserved increase in the severity of punishment that will last the duration of confinement. A downward variance is therefore warranted.

C. <u>Severity of Collateral Effects of Conviction: Sec. 5K2.0 and Sec. 5H1.6</u>

Mr. Dhawan's case also warrants a downward variance based on severe, post-imprisonment consequences of his conviction. The Supreme Court has identified that "as a matter of federal law, deportation is an integral part -- indeed, sometimes the most important part, of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1480, (2010). Circuit courts have further recognized that "the collateral consequences flowing" from alienage may be a basis for departure/variance. *Lopez-Salas* at 847. *See also United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir.1996); *United States v. Smith*, 27 F.3d 649, 655 (D.C.Cir.1994). This logic applies to post-imprisonment considerations.

Mr. Dhawan's case represents an extreme example of the collateral consequences of conviction. If not for his alienage, Mr. Dhawan would serve less than one year confinement, and then return to his friends and family. Instead, he will be separated from his job, friends, and extended family forever. Additionally, pursuant to the Social Security Act, Title 42, under the Social Security Insurance Emergency Plan, immediately upon release, had he been able to stay in the United States, he would receive the following:

- After a 4-day waiting period food stamps worth $180.00,
- Been able to receive a check from between $52-$150 per week until he found a job and is able to sustain himself.
- The Department of Rehabilitation Service would provide the following assistance:
    - Vehicle: $1,900;
    - Dress Clothing: $300;
    - Work Clothing: $400;
    - Tools: $400;
    - Vocational Training Fees;
- Small Business Loan Assistance from the SBA, upto $24,000.
- HUD low cost housing would provide housing with rent ranging from $29.00 to $125.00 per month for two bedroom apartments.

As the Supreme Court observed in *Jordan v. De George*, 341 U.S. 223, 232, (1951),

deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts." Banishment to India, for Mr. Dhawan is particularly an extraordinarily onerous in this case because of the fact that he has been living in the United States since 1992 and had relinquished his economic and financial connections to India he would have to rebuild life with the possibility of being subjected to torture, just because he has returned to India not on his own terms, but deported he would considered anti-national, [9]

---

9  See Khup v. Ashcroft, 376 F.3d 898, 904 (9th Cir.2004) ( The Court may consider the reasonableness of fear "in the political, social, and cultural milieu of the place where[he] lived, and even a ten percent chance of persecution may establish a well-founded fear.").
A sampling of the cases reported by the Indian media suggests that throughout India, torture remains endemic, institutionalized and central to the administration of justice.
See for e.g. from June 2010 – March 2011:
The Tribune, April 10, 2010, reporting:*Custodial deaths due to poisoning*
The Hindu, April 11, 2010, reporting:*Blasts accused facing 'inhuman treatment' in jail.*
The Indian Express, June 4, 2010, reporting: *Cops accused for illegal detention of youth.*
The Tribune, June 4, 2010, reporting: *Illegal detention case, youths were booked for theft, claims cops.*
The Hindu, June 19, 2010, reporting *Custodial death alleged.*
The Indian Express, July 10, 2010, reporting: *Scrap dealer: Police beat me up after accident.*
The Times of India, July 13, 2010, reporting: *Eight police officers beat local politician*
The Sentinel, July 22, 2010, reporting: *Man assualted by Mizoram cop.*
IBN Live, July 27, 2010, reporting: *Boy hung upside down and beaten by police*
Dnaindia.com, July 29, 2010, reporting: *Kurla rape case: Accused alleges police torture.*
The Sentinel, August 9, 2010, reporting: *Youth beaten to death by BSF jawan.*
CNN-IBN, August 16, 2010, reporting: *Probe into death of man in police custody in Sidhi district.*
The Times of India, September 8, 2010, reporting: *Cops in dock for trashing under-trial in custody.*
The Sentinel, September 8, 2010, reporting: *Rally against police atrocity.*
The Times of India, September 10, 2010, reporting: *Ghazipur police accused of torturing accused.*
The Pioneer, September 10, 2010: reporting *Probe ordered against cops for beating to death;*
The Hindu, September 19, 2010, reporting: stating *'Torture' of student by police triggers row.*
The Hindu, October 20, 2010, reporting: *Police torture alleged.*
The Times of India, October 25, 2010, reporting: *Accused alleges cops tortured him in custody.*
The Asian Age, November 3, 2010, reporting: *Man hangs self in police station.*
The Hindu, November 18, 2010, reporting: *Toddy tapper's death in custody sparks protest.*
The Kashmir Times, December 17, 2010, reporting: *Reasi custody death-protests.*
The Tribune, December 19, 2010, reporting: *Sunlight torture case: three cops accused.*
The Pioneer, December 23, 2010, reporting: *Kerela Custody Death: probe ordered.*
The Deccan Herald, December 25, 2010,reporting: *Man dies in police custody.*
The Times of India, February 10, 2011, reporting: *HC orders probe into custodial torture*
The Indian Express, March 31, 2011 reporting *341 custodial deaths in Jammu and Kashmir.*

in order to extract bribes. [10] Further, based on the political situation in India and treatment of women and minors there, it is also inevitable that Mr. Dhawan's wife and children could also be subjected to ruthless assaults, beatings, imprisonment, rape, torture and eventual death at the hands of the members of the Indian Government and police. [11]

---

10 In its December 8, 2011, Report, the Asian Human Rights Commission stated:
"The extent of wilt and demoralization within the law enforcement agencies [in India] is reflected in widespread use of torture. The cases of torture reported by the Asian Human Rights Commission from India illuminates alarming patterns, confirming accusations about the Indian police, that torture is used not just for criminal investigation, but also for extraction of bribes and at the behest of the ruling elite. In that law enforcement agencies in the country have reduced themselves to become a commodity available for a price, rad bribe and favors, and is nothing more than a uniformed criminal gang paid by the exchequer."

11 A. Sample of Child Rape Cases in police custody:
Eastern Mirror, October 28, 2010, *Minors tortured in police custody*
Nagaland Post, October 24, 2010, *Breach in Juvenile law; 3 minors assaulted*
The Times of India, September 18, 2010, *Teens thrown into jails full of criminals*
The Rising Kashmir, September 28, 2010, *Hundreds of students in police custody.*
The Hindustan Times, July 10, 2010, *Minor gang raped inside police station*
The Times of India, May 7, 2010, *Cop rapes minor at outpost.*
The Times of India, October 4, 2010, *Policeman sodomizes a dozen school children*
The Hindu, September 9, 2010, *Person in charge of child protection turns violator*
The Hindustan Times, September 1, 2010, *Juvenile home:inmate complains of torture by seniors.*
The Hindustan Times, August 29, 2010, *Mentally challenged kids brutally beaten by police*
NDTV, September 11, 2010, *Assam Rifles rape and murder of minor Manorama Devi.*
The Pioneer, October 16, 2010, *Police custody rape and murder of minor*

B. Sample of cases showing Women raped in police custody:
The Times of India, January 27, 2010, reporting:*"Rape" by cops.*
The Hindu, February 19, 2010, reporting: *Police inspector beat women in police custody.*
The Telegraph, May 5, 2010, reporting: *Probe begins into rape by cop*
Wall Street Journal, June 5, 2013 (page A9), *U.S. Woman Is Raped In India; No Arrests* (citing, that "U.S. issued a travel warning to American citizens, particularly women, not to travel alone in India * * * Although most victims have been local residents, recent sexual attacks against female visitors in tourist areas underlie the fact that foreign women are at risk." Stating that countries, including United Kingdom, have issued similar warnings).
The Indian Express, July 9, 2010, reporting: *Medical exam conducted on 6 women 'raped' by forces.*
NDTV, July 30, 2010, reporting: *Cops tore my clothes, alleges 25 year old in Delhi,*
Times of India, July 31, 2010, reporting:*Cops detain, brutally torture innocent women.*
The Telegraph, August 12, 2010, reporting: *Suicide after cop 'torture.'*
The Pioneer, October 10, 2010, reporting: *Raped Mutilated Murdered in police custody*
The Hindu, October 26, 2010, reporting: *Fresh allegations of sexual assault by security forces surface*

Essentially, not only Mr. Dhawan would be deported but that would also include his wife and two U.S. citizen children. He would have to be subject his family and himself to the deplorable conditions there. [12] Mr. Dhawan is also not be eligible for assistance upon release from prison, he would, without any assitance, have to find a home to live, find gainful employment, provide his family with daily sustenance and find a place to school his children.

The impact on his wife and honor student children will also be disastrous. His children have been born and raised in the United States with no knowledge of the culture as well as language. Adjusting to a new environment is particularly difficult when the children are not accustomed to the culture and do not know the language. His wife have never worked and thus the burden to be able to feed his family will fall on Mr. Dhawan's shoulders and in India.

Presently, Mr. Dhawan's release date is February 3, 2016, however, to seek admission into a English speaking school, for the 2016 year, Mr. and Mrs. Dhawan would have to present for an interview by the school administrators around October 2015, with proof of income, residence and life style. Based on the present release date, his kids would have to stay

---

The Hindu, November 3, 2010, reporting: *Probe into rape charge in police custody*

12 Amnesty International USA, May 28, 2011, *Annual Report: India 2011*, available at http://www.amnestyusa.org/research/reports/annual-report-india-2011?page=3 accessed on August 2, 2013.
UN Special Rapporteuer *Report on Torture in India* item, 05/02/10 JUA FRDX;TOR;HRD, March 1, 2011.
Asian Human Rights Commission, *Report: The State of Human Rights in India in 2011* www.humanrights.asia/AHRC-SPR-005-2011 accessed on August 2, 2013.
See Asian Human Rights Commission, June 27, 2012, Report on *India: A nation without humanity practicing torture.* http://www.humanrights.asia/news/ahrc-news/AHRC-STM-131-2012, last accessed on August 1, 2013.
South Asia Human Rights Documentation Center, November 6, 2010, *Armed Forces Special Powers Act: A study in National Security tyranny,* http://www.hrdc.net/sahrdc/recources/armed_forces.htm
See Asian Human Rights Commission, December 8, 2011, Report: *India: Human rights a utopia without justice.*http://www.humanrights.asia/news/ahrc-news/AHRC-STM-191-2011, last accessed on August 1, 2013.
United States 8 April, 2011. Department of State *"India" Country Reports on Human Rights Practices for 2010.*

15

home for a full year. Thus, this conviction represents an extreme example of the collateral consequences of conviction not only on Mr. Dhawan, but also his wife and children, that the Court did not take into account.

Mr. Dhawan requests a downward departure/variance to recognize this unique effect on his family. While the court found: that "immigration consequences are far more serious than any sentence I can impose," and sentenced him to 15 months when the plea agreement sought a sentence of 27 to 33 months. *See* Sentencing Transcript, p. 16:1-2. Mr. Dhawna's voluntary waiver of his removal rights, unusually harsh conditions of confinement, and rebuilding his life in a foreign less developed country, for his wife, U.S. citizen children and himself after he is deported, was clearly not contemplated by the Guideline provisions for this offense, nor factored in by the Court when she imposed the sentence. A downward variance cannot remedy these effects, but can, to a degree, offset the extent to which Mr. Dhawan's sentence is more severe than was intended under the Guidelines.

As the court in Mr. Dhawan's case, in essence held, a sentence imposed as per the Guidelines would violate the policies and provisions of 18 U.S.C. § 3553(a) in that it would impose a sentence greater than necessary to comply with the purposes of sentencing, and thus sentenced him to 15 months based on the fact that "when a defendant will ultimately be removed and sent out of the country there is less need for the sentence imposed to protect the public from further crimes of the defendant, or to provide the defendant with needed educational or vocational training." *U.S. v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 733 (E.D. Va.

2005). A further variance would also recognize the decreased need for this sentence to protect society.

This case reflects a disturbing trend toward increasingly punitive sentencing. Moreover, it disregards the district court's discretion to fashion a sentence that, after having the opportunity to hear all the evidence and evaluate the defendant through her words and actions, would better serve both the defendant, his wife, U.S. citizen children and society. Because Prison has diminishing returns, and America has long passed that point where jailing individuals like Mr. Dhawan makes sense. As Mr. Holder said, the system is "both ineffective and unsustainable." Not before time, he has proposed some ways to reform it, consequently this should give the Court the impetus to grant Mr. Dhawan's request that he be sentenced to six months confinement or less.

Federal prisons, which Mr. Holder controls, holds only 10% of America's prisoners; the rest are in state or county lock-ups over which he has little authority. Nonetheless, his reforms are important, and should be applauded. Justice is not a physically quantifiable concept. It is 'truth in action' as held by Benjamin Desraeli. For one thing, the federal-prison population has grown by an alarming 800% since 1980. For another, Mr. Holder's reforms complement action in the states, 17 of which reduced the number of people they locked up between 2000 and 2010 while still reducing crime. The boldest reformers have been conservative states. Now that Mr. Holder has pitched in, penal reform could perhaps be a bipartisan crusade, uniting budget hawks, including the Courts, with bleeding hearts.

In general, shorter sentences are better; they deter nearly as much as long ones and cost far less. Some of the money saved could be spent on better detection, which really does matter. The aim should be reducing crime, not taking revenge. Mr. Holder's ideas have met with little opposition; this Court can help him go further, by granting Mr. Dhawan's request that he be sentenced to six months confinement or less. The Attorney General has taken the first step to repairing the injustices of the United States legal system. It is now up to this Court to follow suit.

## CONCLUSION

For all of these reasons, Mr.Dhawan's case represents a unique set of variables which justify substantial departures and/or variances. A sentence of six months confinement or less adequately punishes Mr. Dhawan and protects society while recognizing Mr. Dhawan's situation, his prospects for rehabilitation, and the harsh conditions of his exile and the subsequent impact on his wife and chidren.

Respectfully Submitted,

*/s/ Anil*

Anil Dhawan
Reg. No.: 68942-054
Adams County Correctional Complex
P.O. Box 1600
Washington, MS 39190.

## CERTIFICATE OF SERVICE

I, Anil Dhawan, hereby declare that I served the aforesaid:

## MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 28 U.S.C. § 2255

which is deemed filed at the time it was deposited at Adams County Correctional Center's depository for legal mail in accordance to *Houston v. Lack*, 108 S.Ct 2379 (1988), by placing the aforesaid motion in a sealed first-class postage-paid envelope addressed to:

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NY 10007-1312

As this case is designated as an E-Filing case, the Clerk is requested to kindly forward this filing to all other parties signed to receive electronic notifications from the Court regarding this case.

Dated:   April, ___, 2014

_____
Anil Dhawan



Criminal Dockchy
SRB 4/13/15

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NY 10007-1312

Legal Mail

Anil Dhawan
Reg. No.: 68942-054
Adams County Correctional Center
P.O. Box 1600
Washington, MS. 39190

RECEIVED
SDNY PRO SE OFFICE
2015 APR 14 P 4:17